The next case, number 221-427, Issara Panate v. Daniel F. Sullivan et al. At this time, would Attorney Scott please introduce himself on the record to begin? Good morning, Your Honors. I'm Robert Scott, here on behalf of the plaintiff appellant, Issara Panate. Your Honors, I think that if this court adopts the ruling of the court below, that it has serious implications for the knock-and-denounce rule itself. On page 10 of the court's ruling, the judge cites two factors, the potential presence of a gun and the potential presence of a rapist, as factors that per se justify a no-knock entry. Graham v. O'Connor and all of its progeny tell us that reasonableness determinations should be made based on all the circumstances. But here, we're taking the question away from the jury and we're deciding it based on simply two conditions, the gun and the rapist. Hypothetically, Your Honors, if you take the gun out of the picture and we're talking about a no-knock entry into a residence, at close quarters, as in two people in the same room, the threat of a gun is not much different than the potential harm that can be done with any number of items that are in a typical household, kitchen knives, baseball bat, any number of items. A person with a knife can bound across a room and plunge that knife into a person's body just about as quickly as he or she can draw and fire a gun. So if this court upholds this ruling, at least on this basis, then it seems to me that the rule itself is in grave jeopardy, except in very narrow circumstances where there's no instruments, potential instruments, of violence available anywhere. So I think, Your Honors, that it's particularly egregious in this case where the police sergeant who was in charge of the case and who directed the filing of the application for warrant did not call for a no-knock warrant. The warrant application does not call for it. The warrant itself does not call for it. But, of course, we all know that the Blackwater law is that the reasonableness of a no-knock entry is evaluated at the time of the entry, not at the time that the warrant is issued. And yet here we have the testimony of Detective Sullivan, who led the SWAT team members who accomplished the initial entry and securing of the premises. We have him telling us that they did knock and announce, that they knocked and announced repeatedly, that Sergeant Radula, who was the one who originally authorized the warrant and did not ask for a no-knock warrant, Sergeant Radula is there. He's aware of what's going on. Detective Sullivan tells us that they could get no response. They heard movement. But when they decided to force the door, he didn't have the right tool, and they had to send someone downstairs to their vehicles to get the pry tool for forcing the door. And that while that was going on, they continued to try to make contact with the people inside or the person inside the dwelling. Now, the jury is entitled to credit my client's testimony that there was no knock and announce. The jury is also entitled, or the court should, under Rule 56, give us every reasonable inference. So the jury is entitled to disbelieve the testimony of the officers that they did knock and announce. And it's also entitled to credit that testimony for the finding that there was no reasonably perceptible need to do a no-knock entry. That's a little tricky. You're asking them to assume X and assume not X. It is a little bit tricky. What's your support for that? Well, I think the rule is that every reasonable inference. Right, but there has to be a reasonable pathway to a verdict. And we look at whether there's a pathway, which means looking at each juncture in the decision-making. And how can you have a pathway that at Step 1 says we find the police did not knock and, therefore, must not have thought they needed to knock? And at Step 2 find that they did the opposite. Because the testimony is essentially an admission that there was no need for a no-knock entry. There is the only argument in favor of a no-knock entry that we have comes from the court. The police never said we were justified in. The police said we did knock and announce and we should have. But they didn't, according to my client. And the rule requires us to make those inferences and to allow the jury to credit the testimony of one witness over another. So you're making a slightly different point. You're simply saying that there's no evidence that any of the officers who perceived all the circumstances of the scene thought there was a need to do a no-knock. That is correct, Your Honor. Now, the statement by the court that the presence of the rapist and the potential presence of a rapist and the potential presence of a gun, per se, mean that a no-knock entry is justified is made without authority. We have, there is no citation to any case in support of that proposition. We have U.S. v. Bates in the Sixth Circuit where the court there held that simply the presence of a gun does not in and of itself justify a no-knock entry. The other thing, I think, Your Honors, more generally, is that the standard is that we look at all the circumstances and that unless, and that it's a jury question, unless, of course, no jury could reasonably decide one way or the other. Here we have a whole panoply of circumstances that the court simply ignores in making this analysis based on two factors. The location that they, as you know from looking at, excuse me, Your Honors, as you know from looking at the fact pattern, this warrant was executed at a house that was indicated or identified, a three-level building that was identified by a rape victim. And she, it seems obvious with the aid of hindsight that it was the wrong dwelling, that she didn't understand what dwelling she was at. But that, in this particular, that's a circumstance that's very foreseeable under the facts of this case. Because she ran from that house in the middle of the night, half-naked, barefoot. She didn't take the time to note the address or to study the features of the building, which is somewhat nondescript. And there's an error in the pleadings where the defendant's state that the building was identified. The victim was brought back to the location and identified the location where she believed she had been raped. And also identified a vehicle at that location that she said was the vehicle that she had, that the rapists had brought her to the location in. That is not what the evidence is. Paragraph 15 of the defendant's statement of facts explains how the victim was brought to the location. And she identifies the building as the place where she was raped. And she points to a gray SUV and she says, that could have been the car that I came in. I think that's important because, and that is the fact, the victim did not state, that's the car. She said, that could have been the car. So the officers know that she fled from this house in the dark of night after a gang rape, a traumatic experience. And she was fleeing for her life because they did have a gun. And she thought this could be the car. So the identification of the location is not ironclad. The possibility that this could be the wrong location is not a highly conjectural possibility from the law enforcement point of view. Caution is indicated. Extreme caution is indicated. This is a residential area. It's not unforeseeable that you could have a 19-year-old pregnant woman taking a nap in this building. This is the community. This is where people live. But so, I mean, why does any of this matter? They should have done more investigation before they got the warrant? Well, that is our argument, that the investigation itself was shoddy. But I think beyond that, that in terms of executing the warrant, this is part of the circumstance that this may be part of the reason why they didn't ask for a no-knock warrant. The police did not see any need for a no-knock warrant. Not only do we have the testimony from Detective Sullivan at the scene, but we have all of the circumstances. Ultimately, though, we have to ask not what the officers, these particular officers, thought of the circumstances that they saw. We have to ask what an objectively reasonable officer in that situation, how that officer would assess the situation. And so, doesn't that drop out of the equation, the subjective belief that these officers had? I'm sorry, Your Honor, the subjective belief being... You've made repeatedly the point that these officers didn't think there was a need. Is that a question we even ask, or do we ask what an objectively reasonable officer in that situation, observing what they saw, how would that hypothetical officer react? Yes, Your Honor. So these officers do not say that there was not a need for a knock-and-announce, and that's evidence bearing on what an objective officer would say. The circumstances, but I agree, Your Honor, it's all the circumstances, and it's what an objective officer would do. But the fact that the sergeant in charge didn't, and he was on site, didn't see the need for a no-knock warrant, I think is persuasive. It should be highly persuasive, and certainly would be persuasive to a jury. And I think that's my real point, is that this is a jury question. Of course, where no reasonable jury could reach a given finding, and it's the job of the court to say as a matter of law. But within the... You might want to take a minute to address the qualified immunity issue, too. In other words, what precedent do you point us to that says, let's assume we agreed with you that they should not have done a no-knock? What precedent would have told them beforehand that they shouldn't have? So, Your Honors, the qualified immunity analysis requires the court to establish the facts for purposes of summary judgment. And then based on those facts, to make the qualified immunity analysis. So the analysis then is that no reasonable officer could have mistakenly believed that it was reasonable to do a no-knock entry on the premises. And I think that this, again, goes through all the circumstances. Would your argument be any different if the warrant were being executed, say, an hour after the incident? It would change the picture substantially. This rape happened in the middle of the night. They did not... They did no surveillance. There was a lot more doubt as to what was going on. So what is it that actually changes with respect to your argument about the dangerousness of a firearm versus another weapon, or the presence of a potential violent criminal? What is it about the timing that makes a difference? I think it makes a difference in terms of having a warrant and rating that location. Because the police knew that these perpetrators didn't live at this location. So if it's within an hour or so of the incident, then they're more likely to be there. And there's greater... And they're more likely to be there with the gun. The record shows, regarding how long a weapon was pointed at your client. The testimony is conflicting. The plaintiff states that guns, or at least one gun, were trained upon her until she was brought out over the threshold of the dwelling. I think the police testimony is that the guns were holstered almost immediately when she came through the curtain. So it's not a huge difference in terms of the amount of time. But from her point of view, she was under... She was covered under the guns for several seconds while she was being... The guns weren't taken off of her until they were out of the hallway. But admittedly, Your Honor, when she first encounters them, she's not that far from the door. The only other thing, of course, is the trauma induces her delivery. And we have a medical opinion that it's a very substantial trauma. And so I think if the guns were holstered instantly, the trauma would not have occurred, or it would have been greatly abated. Did you cite a case, Bates, U.S. v. Bates? Is that a case? U.S. v. Bates, Sixth Circuit, Your Honor. Thank you. That's all right, Will. Thank you very much, Your Honors. Thank you, Counsel. At this time, Attorney Quinn will introduce herself on the record to begin. Good morning, Your Honors. May it please the Court, Wendy Quinn, on behalf of appellees Daniel Sullivan, Gary Jum, George Adams, Donna Brissett, and the City of Worcester. This is a case concerning the execution of a search warrant by members of the Worcester Police Department SWAT team and Detective Bureau. Here, there was no constitutional violation and no viable cause of action so that the District Court properly granted summary judgment. Appellant Isora Pignate had some struggles in her life. However, her difficulties do not transform this case into one of a civil rights violation and negligence cause of action against members of the Worcester Police Department and the City of Worcester. The investigation of the police into an armed sexual assault in the early morning hours of April 12, 2016 led Worcester Police to execute a search warrant later that afternoon at Ms. Pignate's residence. This was a valid warrant that Detective George Adams had obtained after the victim had provided Detective Donna Brissett with an in-person identification as to the residence in which she had been assaulted and next to the parking lot where the perpetrator's vehicle was parked. It is hard to imagine a more compelling identification of that residence as it was in this case by the victim driving by and pointing out the exact place where she had been assaulted. Detectives had employed their due discretion in their investigation in applying for the search warrant so that the search warrant was supported by ample probable cause and contained no obvious defects. Detective Daniel Sullivan supervised the officers in the execution of the SWAT in the entry of the SWAT team into 22 Preston Street, Apartment 3. He remained in the back and that SWAT team was used due to the high risk nature of the warrant, the presence of a firearm. When no one answered the door that afternoon but the officers heard the movement inside, the officers did enter and it is disputed of course that the officers made many attempts to announce their presence. When you say when no one answered, for summary judgment purposes, we can't think that way, can we? Don't we have to accept the testimony that she heard no one call? That is true, Your Honor, and that is what the district court did. So the district court properly credited the plaintiff's version of events as to no knock and announce. And I would submit that it was a proper decision by the district court to look to the Wisconsin v. Richards case and determine that those circumstances must be evaluated at the time of entry and the presence of a firearm and the severe nature of the offense that the officers were responding to did justify a no knock and announce for their entry. Wouldn't it have helped if the officers had checked to see who owned or rented the apartment? That attempt was checked, Your Honor. They did check and it is not true that they knew where the one man, Chino Lopez, who had been identified as a possible perpetrator of the assault, they did not know where he lived and they did not know for sure that he was not at that location. I'm confused. Did they check records or whatever else to see who lived in that apartment or were they checking to see where the man lived that they knew was a suspect in the rape? The report, Detective Brissette said that she searched RMV records for Chino Lopez and was not able to find that person in RMV records. I think it was a nickname as they later did discover a potential first name for that suspect. And it did not necessarily matter to the detectives who lived in that apartment. It's the top floor of a triple decker. The owner of the building was not likely the person who lived there. It was a rental unit and certainly a crime can be committed at a location where a person does not live. How can you say it did not matter who lived there? If someone who they had no reason to suspect of any crime lived in that apartment, a no-knock warrant places those people in danger. So if they found out that there was someone who they had no reason to suspect of any crime owned and lived in that apartment, you're saying they still would have done a no-knock? Your Honor, I think it's not that it doesn't matter. I'm sure it was a consideration. However, an assault can certainly occur at a place where a person does not live. So if it was a consideration, I go back to my question, did they check to see who owned it? I think the answer is no, who was renting it. What they did was they checked to see if Chico could be associated with that address, but that was it. I don't recall what Detective Brissette's testimony was on that point, Your Honor. I do know that her report does not indicate that that location was the owner's, who lived there was affirmed prior to the entry. A plaintiff does not distinguish, in the lower court, between the excessive force claim and the alleged unlawful entry claim, as far as the first count went. So certainly we think that the district court was correct in determining that there was no showing of excessive force on the part of the officers. And in the execution of the search warrant here, the officers had the authority to detain and handcuff all persons subject to search. Ms. Pinante was not handcuffed or searched. However, even so, the authority is categorical. It doesn't depend on the quantum of proof for detention or to the extent the intrusion is imposed. With respect to both the entry itself and the display of arms by the police officers, what is the import, if any, of it being 12 hours later and in the afternoon, as opposed to during that same night when the incident occurred? I would say, Your Honor, that it does not distinguish the high-risk nature of the execution of the warrant and the entry of the police to know that the armed assailant could be present in the apartment. And if the police received the report of the crime three or four days later and then got the warrant, would that make a difference, that lapse in time? That lapse in time, there may be a point where the objectively reasonable officer would not be warranted in entering without knocking and announcing. I'm sure that there's some period of time where that would occur. But here, I don't think that the same day after the assault occurred, that an entry in that short of a time period would extinguish the nature of the high-risk entry. There's some blurring, too. I would like to point out that of the allegations against these particular defendants, Detective Daniel Sullivan was the supervisor of the SWAT team entry, so he remains at the back of the group. It's true that the first person who entered, Officer Nate Reando, he did have his firearm drawn because when they entered, he could see an individual behind the curtain separating the rooms. And so his firearm was pointed until that person came out and the officer saw it was a very young, visibly pregnant female. Then the woman was escorted by Detective Sullivan, and there's no evidence that Detective Sullivan pointed a firearm at Ms. Pinata at any point in time. Can I just add, there was some indication, I think, that they didn't have the proper tool to do the forced entry. Do you know what the record shows about those details? If the police knocked and announced, I think I could understand why they wouldn't have brought the tool up from downstairs, or did they bring the wrong tool? My point being, in the first instance, my point being, if they had intended to do a no-knock entry, presumably they would have brought the right tools, right? So what does the record show about that? The record shows that when they got up to that third floor, I think as they were knocking and announcing in English and in Spanish, a period of time, they realized that it was not a door that could be breached. It opened outward, so that it needed to be pried open by the Halligan pry bar, rather than, they do have some sort of ram. Did they bring that with them in the first instance? That's what I'm asking. Yes, I believe so. Given the number of guns that there are, I could imagine someone saying, well, on any time you're going to execute a search warrant at a house, there's always a decent chance there'll be a gun in the house. If we then say the presence of a gun, or the substantial possibility that there'll be a gun there, which is all we have here, justifies no-knock, we've kind of got to the point where no-knocks can be done almost any time. How do we avoid getting to that point, given the hazards posed by no-knocks to anyone inside and to the officers themselves? I think, Your Honor, that not having any evidence of any firearm would not have prompted a SWAT team entry in the first place. Here they have a possibility, let's call it a pretty good possibility, that there may be a gun in this apartment. They don't know for sure that the guy's still there and he had it on him. So if that's enough to justify a no-knock, what house in this country would you say there isn't a possibility that there's a gun in it? I would say certainly the violent nature of the crime, Your Honor. That would be how we would limit this. We would say if it's a violent crime? Yes, I think so, Your Honor. If there was not a violent crime and there was not a presence of a firearm used in that violent crime, the Worcester Police Department likely would not have used the SWAT team to begin with. So then it's likely that if it were just the detectives appearing to investigate at that residence with a knock-and-announce warrant, they would not have even the tools to knock down a door. So it was really the high-risk nature of the entry that prompted the use of the SWAT team in the first place. And then I think warranted the use of the entry, arguably, without knocking and announcing. So I think, too, here, as Your Honor certainly pointed out, and the judge footnoted, that although there was no distinguishing factors between the plaintiff's argument with regard to excessive force and the unlawful entry that was alleged, that qualified immunity would apply here, because certainly the qualified immunity applies here. The decisions made by the officers were discretionary and not made in a reckless manner. And it was at least questionable whether the actions were proper and therefore qualified immunity attaches. Here, there was certainly no evidence or no prospect of proving at trial that Ms. Pinata could make a showing as far as her intentional infliction of emotional distress claim. The conduct of the officers did not exceed all possible bounds of decency. And lastly, the negligence claim against the City of Worcester was also not viable because of the application of the Massachusetts TOR Claims Act, Chapter 258, Section 10b, wherein municipalities are immune from discretionary actions of public employees within the scope of their employment. Based on their experience and knowledge of the law, to determine what evidence to seek, how to gather it, when and whether to apply for a search warrant. These were quintessential discretionary decisions on the part of the officers. And it is the SANA versus Commonwealth case that had stated that even though an injury is alleged by the plaintiff, stress, inconvenience, those sorts of things cannot be wholly unexpected in what is an unavoidably imperfect system of law enforcement. But here, the detectives really properly exercised their discretionary decisions to take an in-person identification of the residents as the location of the assault from the victim herself. Executed a search warrant. When they realized that Ms. Penate was there, they certainly treated her with the utmost respect and care. And so, the Worcester appellees take the position that they were properly granted summary judgment. We ask this honorable court to affirm the district court's decision.